would entitle the latter to recover damages for the loss of future profits.

The report of the referee should be confirmed as to all the claimants, without costs.

---

(26 App. Div. 624.)

### FLINT v. RUTHRAUFF et al.

(Supreme Court, Appellate Division, First Department. February 25, 1898.)

GIFT OF CHOSES IN ACTION—WHAT CONSTITUTES.

Plaintiff bequeathed defendant a specified legacy absolutely, without provision as to its disposition in case of defendant's prior death. Subsequently she delivered securities to defendant, stating they were for defendant provisionally in case of plaintiff's prior death, and the income therefrom was in lieu of a monthly allowance theretofore given defendant. Subsequently she gave defendant other securities; telling her they were for the same purpose, but that she could not have the income therefrom. The securities, at par, amounted to the legacy. Plaintiff informed defendant she would destroy her will, and gave her a writing stating she had that day given defendant securities of a stated amount. The securities were exchanged for others, and, with plaintiff's knowledge, registered in defendant's name. *Held,* that plaintiff had made a valid gift of all the securities, except the income from the second parcel, subject to be defeated only by defendant's dying before plaintiff.

Appeal from trial term.

Action by Helen Flint against Eleanor M. Ruthrauff, impleaded with the Second National Bank of the City of New York. There was a judgment for plaintiff, and defendant Ruthrauff appeals. Affirmed.

The following is the opinion of the lower court (CHASE, J.):

This action presents a question of fact only. In the spring of 1885 Miss Ruthrauff advertised in the New York Tribune, offering her services as professor of music for a home through the summer months. The plaintiff answered this advertisement, and an arrangement was made by which Miss Ruthrauff remained with Miss Flint through the summer months, teaching Miss Flint's little cousins. Miss Ruthrauff then ceased teaching, but continued to live with Miss Flint and keep house for her, and was her companion. They became very warm friends. Miss Flint made to Miss Ruthrauff an allowance,—at first, $10 per month, and afterwards of $50 per month. While their relations were very friendly and intimate, they were both intelligent and experienced women, and there is no evidence of any intention on the part of either to take advantage of the other. In the spring of 1889 Miss Flint made her will, in which she gave to Miss Ruthrauff a legacy of $25,000 absolutely. Miss Flint testifies that she told Miss Ruthrauff of the provision she had made for her, and, referring to Miss Ruthrauff, further says: "She was very grateful, and immediately assured me that the money would never go to her family, or any one related to her; if she should survive me, she should leave it to my relatives on her death." This statement on the part of Miss Ruthrauff was a voluntary statement, and the will does not appear to have been made pursuant to any prior understanding with regard to what disposition Miss Ruthrauff should make of the legacy in case of her death. Miss Ruthrauff made her will about the same time, of which Miss Flint had knowledge, by which will she gave all her property to Miss Flint; but nothing whatever is said in her will in regard to the disposition of the property in case of Miss Flint dying before her death. In case of the death of either after the making of their wills, the legacy in the will of the survivor would have lapsed. There were talks between Miss Flint and Miss Ruthrauff thereafter regarding the will, and

in regard to possible objections being made to the will by Miss Flint's relatives; and in December, 1890, Miss Flint testified, she took from her box in the Lincoln Safe-Deposit Vaults $10,000 of Tennessee Coal & Iron Company's bonds, and gave them to Miss Ruthrauff to put in her box, saying: "These bonds are provisionally for you in case of my death. You may have the coupons, and deposit them to your credit at the bank. I shall cease paying you the allowance, and the coupons will take the place of those payments." Miss Flint further testifies as follows: "Miss Ruthrauff was profuse in her thanks,—moved to tears by my kindness, as she says,—and assured me then, as in the case of the will, that, if she survived me, the bonds, or their value, would go to my relatives, or those among them who were in need of money." From that time Miss Flint ceased to pay the allowance, and Miss Ruthrauff had the coupons. Miss Flint further testifies that on the 22d day of December, 1890, they were again at the Lincoln Safe-Deposit Vaults, and that she took $10,000 of Brooklyn Elevated bonds and $5,000 Richmond & Danville bonds from her box, and they were put in Miss Ruthrauff's box, and at the time stating that "the bonds were also provisionally for Miss Ruthrauff in case of my death; that she could not have the coupons, as I needed them for household expenses. I could only afford to pay her $600 a year. The coupons must be given to me. And then I said that I should destroy the will in which I had left her $25,000, and that was soon after destroyed." Miss Flint, referring to Miss Ruthrauff, further says: "Upon receiving them, she again expressed her gratitude, and immediately assured me, as in the other cases, that, if she survived me, the bonds, or their value, would never go to her family or relatives; that she would leave them to mine." On this 22d day of December, 1890, Miss Flint made and delivered to Miss Ruthrauff a paper as follows: "This twenty-second day of December, 1890 (December 22, 1890), I give to my friend Eleanor M. Ruthrauff twenty-five thousand dollars ($25,000) in bonds, and have [the word "have" scratched] now place the bonds in her box. Helen Flint." Miss Flint in a few days thereafter made a new will, leaving out the legacy to Miss Ruthrauff. Miss Flint continued to collect the coupons on the $15,000 of bonds. In the spring of 1894 the Tennessee Coal & Iron bonds were replaced with bonds of an equal amount of Western Union collateral trust, and the Richmond & Danville bonds were replaced by an equal amount of Metropolitan Elevated. With Miss Flint's knowledge, they were all registered in the name of Miss Ruthrauff. The whole object and purpose of these gifts was to protect and benefit Miss Ruthrauff, and make her more certain to receive the $25,000 in case of Miss Flint's death before the death of Miss Ruthrauff. The statements made by Miss Ruthrauff on receiving these gifts were voluntary statements, and the gift was in no way dependent upon such statements. According to Miss Flint's testimony, the gifts were made to depend upon her (Miss Flint) dying before Miss Ruthrauff. They were "provisional." The writing of December 22, 1890, is absolute on its face, but it was only intended for protection to Miss Ruthrauff in case of Miss Flint's death before Miss Ruthrauff's death. In case Miss Flint died before Miss Ruthrauff, she undoubtedly intended the gift to be without condition, and that the paper, absolute on its face, should be used as evidence of her intention, without qualification. Miss Ruthrauff says the bonds were all given to her at one time, and in her room, and not at the Lincoln Safe-Deposit Vaults. Miss Flint may be mistaken with respect to this. Miss Ruthrauff's testimony shows that she accepted the gift with the understanding or qualification that Miss Flint should have the income, except· as to the extent of her allowance. All the occurrences prior to 1896, as well as the letters of Miss Ruthrauff to Miss Flint, indicate a continued recognition of the right of Miss Flint to assert some authority over the disposition of the bonds. I am satisfied from the whole testimony that Miss Flint intended to make and did make to Miss Ruthrauff a valid gift of the bonds, subject to the income on the $15,000 being retained by her during her life, and subject to the gift being entirely defeated in case of Miss Ruthrauff's death occurring before her death, and that a trust was created to carry out such intention. A judgment may be entered appointing the Union Trust Company trustee, to take and hold all the bonds and pay the income on the $10,000

Western Union collateral trust bonds to Miss Ruthrauff during her life, and on the other $15,000 of bonds to Miss Flint for life. In case Miss Ruthrauff dies before Miss Flint, the principal to be paid to Miss Flint; and, in case Miss Flint dies before Miss Ruthrauff, the principal to be paid to Miss Ruthrauff. Miss Ruthrauff, at her option, may hold these bonds on giving a bond to Miss Flint in the sum of $25,000, with surety or sureties to be approved by a justice of the court, conditioned to carry out the provisions of the judgment to be entered herein. No costs are allowed, except the sum of $50 allowed to the defendant Second National Bank, to be paid by the defendant Ruthrauff.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

D. McCurdy, for appellant.
B. Winthrop, for respondent.

PER CURIAM. Judgment affirmed, with costs, on the opinion in the court below.

---

### LECK v. RUDD.

(Supreme Court, Trial Term, New York County. April, 1898.)

ACTIONS—NATURE—CONTRACT OR TORT.
    Defendant agreed to furnish plaintiff, a retail milk dealer, with pure and wholesome milk. He furnished adulterated milk, however, and plaintiff was convicted for reselling it. *Held*, that an action on the contract would not lie for damages resulting to plaintiff's business from the conviction, since the cause of action arose ex delicto, provided defendant knew he was furnishing impure milk.

Action by William Leck, an infant, etc., against John Rudd, to recover damages for breach of contract. Dismissed.

T. E. Murray, for plaintiff.
A. B. Carrington, for defendant.

McADAM, J. The complaint charges that the defendant, a wholesale dealer in milk, sold to the plaintiff, for use in his business, a quantity of milk, on the agreement that it should be pure and wholesome; that, relying upon this agreement, the plaintiff received from the defendant, and sold to customers from day to day, certain of said milk, which he believed to be pure and wholesome; that on August 22, 1895, a milk inspector tested certain milk which the plaintiff on that day had received from the defendant under said agreement, and, on September 4th following, caused the plaintiff's arrest for selling adulterated milk; that, upon a trial subsequently had, the plaintiff was convicted of the offense, and fined $100; and that the publication of his arrest and conviction injured his business. This is not a case where a vendee is seeking to obtain the difference between the market value and the agreed price of the thing sold; nor is there any allegation that the vendee had paid the agreed price, so as to make such difference recoverable. The action is to recover for a remote consequence of the sale,—injury to the vendee's business, caused by his arrest and conviction,—not within the presumed contemplation of the parties. In order to recover consequential dam-