In the Matter of the Estate of MARGARET P. HUMPHREY, Deceased.

D'ANJOU PEARSALL, as Administrator, etc., of MARGARET P. HUMPHREY, Deceased, Respondent; WALTER A. EVANS, Appellant.

First Department, March 19, 1920.

Gift — gift of bonds *inter vivos* with agreement that donor shall receive income therefrom for life — alleged gift of stock not constituting gift *inter vivos* — agreement that donor shall receive income and have title to stock if she survives donee.

There may be a valid gift of bonds *inter vivos*, although the donor is entitled to receive the income therefrom during her life, if in fact there is no limitation placed on the right of the donee to have dominion or control over

the bonds, or any agreement that they are to revert to the donor should the donee predecease her.

But where stock was delivered to an alleged donee with an agreement that all the dividends therefrom should be payable to the donor during her lifetime, and that in the event that the donee should predecease the donor the stock should revert to the donor, and that to effectuate this purpose the stock should not be transferred to the name of the donee during the lifetime of the donor, there was not a gift of the stock *inter vivos*, as the donor had not divested herself absolutely of title and control and retained a power of revocation so that the transaction was testamentary in its nature.

SMITH, J., and CLARKE, P. J., dissent in part, with opinion.

APPEAL by Walter A. Evans from a decree of the Surrogate's Court of the county of New York, entered in the office of the clerk of said court on or about the 8th day of November, 1919, directing him to turn over to D'Anjou Pearsall, as administrator, etc., of Margaret P. Humphrey, certain personal property.

*Stuart McNamara* of counsel [*Garret A. Brownback* and *Raymond B. Seymour* with him on the brief], for the appellant.

*William M. Wherry* of counsel [*James M. Blackwell* with him on the brief], *Blackwell Bros.*, attorneys, for the respondent.

PAGE, J.:

In so far as the decision of the court relates to the gift of the bonds, I concur in the opinion of Mr. Justice SMITH. The allegations of the answer show a present voluntary gift of the bonds; that upon the respondent's insistence the decedent agreed to receive the interest payable on the bonds from the date of delivery until her death and that the respondent thereafter detached all coupons from said bonds as the same matured from time to time until her death and either delivered the same to the decedent or cashed said coupons himself and paid the amount thereof to the decedent. There is no allegation that these bonds were to revert to the donor in case the respondent should predecease her, nor was there any limitation on his right to dispose of them. The donor parted with all right of dominion or control over the bonds. The agreement of the donee to pay the interest on the bonds to the donor during her lifetime would not invalidate the gift of the bonds under the authorities cited by Mr. Justice SMITH.

In my opinion the allegation of the answer concerning the stock is not sufficient to show a valid gift *inter vivos*. The stock was alleged to have been delivered upon the agreement " that all dividends thereafter payable on said stock during her life should be paid to her and that in the event that the respondent should predecease said decedent, the said stock should revert to her, and that for *this purpose* the certificate should not be presented for transfer into the name of respondent during the lifetime of decedent." (Italics are mine.) Therefore, all that Walter A. Evans secured by the delivery of this stock was the possession thereof. The title still remained in Margaret P. Humphrey. This clearly appears from the fact that there was no agreement to retransfer or to bequeath it by will, but that the stock, in the event of Evans' death before Mrs. Humphrey's would revert to her. The certificate was to remain in her name, and it was a part of the agreement that all dividends on said stock during her life were to be paid to her. Therefore, Evans merely held the stock during her lifetime with the agreement that he could transfer it to himself after her death. There can be no doubt under these circumstances that Mrs. Humphrey could have at any time revoked the transaction. Until the donor has divested herself absolutely and irrevocably of the title, dominion and control of the subject of the gift she had power to revoke. (*Curry* v. *Powers*, 70 N. Y. 212; *Lehr* v. *Jones*, 74 App. Div. 54.)

In the present case Mrs. Humphrey reserved to herself title to the stock and the enjoyment of the income derived therefrom during her lifetime. It was only after death that the gift would become effective. This was insufficient to establish a gift. (*Young* v. *Young*, 80 N. Y. 422, 435.)

I, therefore, am of opinion that as to the stock the learned surrogate correctly held that the transaction was testamentary and void. As to the bonds, however, for the reasons stated in the opinion of Mr. Justice SMITH, the transaction was a gift *inter vivos* and not testamentary. The decree of the surrogate must, therefore, be reversed and the matter remitted to the Surrogate's Court, to proceed in accordance with the opinion of this court.

LAUGHLIN and MERRELL, JJ., concur.

SMITH, J. (concurring in part):

The proceeding was started by a petition of this administrator for a discovery and for the turning over of said property. Evans in his answer asserted title in himself by reason of a gift which had been perfected before the death of Margaret P. Humphrey. The property here involved consists of some stocks and bonds. The answer admitted that this gift was conditioned, in respect to the stock, by an agreement that the dividends upon that stock should be paid to Margaret P. Humphrey during her life and, further, if Evans should die before she did, that the stock should be returned to her. In respect of the bonds the gift was conditioned according to agreement upon Evans transferring to her the interest received upon the bonds during her life.

There is a question as to the form in which this appeal is brought here — whether the opening of counsel is to be considered in connection with the answer. But both parties agreed upon the argument that this should be treated as a motion upon the pleadings and that the answer alone was to be regarded not in any way modified by anything said in the opening. Moreover, I find nothing in the opening of defendant's counsel which in any way alters his position as pleaded by him. Courts are always chary in dismissing complaints upon the opening of counsel, unless such opening clearly discloses a state of facts inconsistent with the allegations of the complaint. As stated by Judge O'BRIEN in *Hoffman House* v. *Foote* (172 N. Y. 348): " The practice of disposing of cases upon the mere opening of counsel is generally a very unsafe method of deciding controversies, where there is or ever was anything to decide. It cannot be resorted to in many cases with justice to the parties, unless the counsel stating the case to the jury deliberately and intentionally states or admits some fact that, in any view of the case, is fatal to the action." Judge HISCOCK, in *Sweeney* v. *O'Dwyer* (197 N. Y. 505) states: " It is possible that facts might be proved * * * and counsel did not make his statement of what he intended to prove so full and complete as to exclude the idea that possibly evidence might be offered under the general allegations of the complaint of such additional facts which would sustain this second cause of action. Therefore, plaintiff in the present situation is entitled to count

on this element of possibility and insist that he shall have an opportunity to develop it on the trial." Again, in *Murphy* v. *Hopper* (75 App. Div. 606) Mr. Justice INGRAHAM says: " * * * as the complaint alleges a good cause of action which was dismissed upon the opening, that dismissal cannot be sustained unless it appears that the allegations of the complaint were expressly limited by the opening and that upon the facts therein stated, as the only facts that the plaintiff could prove, there was no cause of action."

It cannot for a moment be claimed that the defendant in his opening stated any facts that were intended to limit his pleading, and I am wholly unable to find any facts stated inconsistent with the allegations of his answer.

Considering this question then as raised upon the defendant's pleading, we are not concerned with the possibilities of his being unable to prove the allegations of his defense. That such proof can be made we must assume, and upon that assumption there are two questions presented.

*First*, whether a gift *inter vivos* of bonds with the reservation that the donor shall receive the income from the bonds during life is a valid gift *inter vivos*, or is merely a testamentary provision.

*Second*, whether the additional reservation that if the donee should die before the donor the property should revert to the donor's estate is inconsistent with the gift *inter vivos*. Upon the first question we think the authorities are clear.

In *Judson* v. *Hatch* (171 App. Div. 246) the executors sued to recover ten shares of Singer Company stock which had been delivered by the decedent to the defendant, indorsed in blank, but not transferred on the books of the company until shortly before the testatrix's death. The defendant claimed the stock as a gift *inter vivos*. Mr. Justice McLAUGHLIN in writing for this court said: " * * * she shortly thereafter delivered the certificate indorsed in blank to him, and the appellant then stated to her that as long as he could he would keep the stock in her name so that she could receive the dividends. * * * Nor do I think the fact that the dividends were paid to her, under the circumstances, indicates that the delivery of the certificate was not intended as a gift of the stock. * * * Certainly this fact, standing alone, cannot be said to overcome the evidence tending to establish a valid gift *inter vivos*."

In *Beaumont* v. *Beaumont* (152 Fed. Rep. 55), in the Circuit Court of Appeals, Mr. Justice GRAY stated: " We know of no rule of law by which the dissociation of the interest or coupons on these bonds, and their reservation to the donor for the purposes of the gift, would invalidate a gift of the bonds themselves to the donees, as testified to by the brother of the plaintiff in error.   *   *   *   We do not think that this clear intention on the part of Lucius Beaumont should be or can be defeated by the technical suggestion of so construing the gift intended to be made, as that it should be void as an attempted testamentary disposition of the bonds."

In *Matter of Wright* (139 App. Div. 1) a gift was made upon an agreement to pay four per cent interest during life to the donor.   Mr. Justice DOWLING, writing for this court, says: " The proof is convincing that she made a gift to her daughter, Mrs. Callen, of approximately $4,500.   *   *   *   The agreement to pay interest upon the gift during the mother's lifetime did not invalidate the gift."

In *Young* v. *Young* (80 N. Y. 431) RAPALLO, J., says: " But if an absolute delivery of the bonds to the donee, with intent to pass the title was made out, the donor reserving only the right to look to the donee for the interest, the transaction may be sustained as an executed gift."

In *Bone* v. *Holmes* (195 Mass. 495) a gift was made upon the agreement that the donor should receive the dividends during her life and that the stock was not to be transferred out of the donor's name, and such dividends were in fact transmitted by the corporation directly to the donor's bank and deposited to her credit, and also a certain bond was handed to the donee on condition that the latter cut off the coupons and give them to the donor during her life.   The court sustained the gift of the stocks and the bond, stating that the fact that the stock had not been transferred upon the books of the corporation, did not avoid the gift, and continued: " A reservation of the interest for the life of the donor would not prevent the gift from taking effect."   As to the shares of stock the court said: " The stock was not transferred on the books of the corporation, and it was intended that the dividends should be paid to Mrs. Allen for her life.   But we have already seen that these circumstances are not conclusive against Miss Bone's contention that

as between the parties there was an absolute transfer of the title to her."

If other authority be needed we think the appellant's contention may firmly stand upon the decision of *Flint* v. *Ruthrauff* (26 App. Div. 624; affd., 163 N. Y. 588). That case is as nearly parallel to the case at bar as could well be found, and is to my mind a final authority upon both questions of law presented. The case was tried by Mr. Justice CHASE, sitting in this department at Special Term. The defendant came to the plaintiff as a companion and the parties became warm friends. Miss Flint first made to Miss Ruthrauff an allowance of $10 per month, and afterwards of $50 per month. Their relations were very friendly and intimate and they were both intelligent and experienced women, and there was no evidence of any intention on the part of either to take advantage of the other. In the spring of 1889 Miss Flint made her will, in which she gave to Miss Ruthrauff a legacy of $25,000 absolutely. She informed Miss Ruthrauff of the provision she had made and she swears that Miss Ruthrauff was very grateful, " and immediately assured me that the money would never go to her family or anyone related to her; if she should survive me she should leave it to my relatives on her death." Miss Ruthrauff made a will about the same time, of which Miss Flint had knowledge, by which will she gave all of her property to Miss Flint, but no provision was made in case Miss Flint died before she did. There was some question raised about the possibility of the relatives of Miss Flint making objections to this will, and in December, 1890, Miss Flint testified that she took from her box at the Lincoln Safe Deposit Vaults $10,000 of Tennessee Coal and Iron Company's bonds and gave them to Miss Ruthrauff to put in her box, saying: " These bonds are provisionally for you in case of my death. You may have the coupons and deposit them to your credit at the bank. I shall cease paying you the allowance, and the coupons will take the place of those payments." Miss Flint further testified that Miss Ruthrauff was profuse in her thanks and assured her, as in the case of the will, that if Miss Ruthrauff survived Miss Flint the value of the bonds would go to Miss Flint's relatives, or those among them who were in need of money. From that time Miss Flint ceased paying the allowance and

First Department, March, 1920.            [Vol. 191.

Miss Ruthrauff had the coupons. Miss Flint further testified that on the 22d day of December, 1890, they were again at the Lincoln Safe Deposit Vaults, and that she took $10,000 of Brooklyn Elevated bonds and $5,000 Richmond and Danville bonds from her box and they were put in Miss Ruthrauff's box, at the time stating that "the bonds were also provisionally for Miss Ruthrauff in case of my death; that she could not have the coupons as I needed them for household expenses. I could only afford to pay her $600 a year, the coupons must be given to me." Miss Flint's will was then destroyed. She had already delivered to Miss Ruthrauff the $25,000 in securities. Miss Flint swore that upon receiving these latter funds, Miss Ruthrauff also stated that if she survived Miss Flint the bonds would go to Miss Flint's relatives. On the 22d day of December, 1890, Miss Flint made and delivered to Miss Ruthrauff a paper, as follows:

"This twenty-second day of December, 1890 (December 22, 1890), I give to my friend Eleanor M. Ruthrauff Twenty-five thousand dollars ($25,000) in bonds and have now placed the bonds in her box."

"HELENA FLINT."

Miss Flint continued to collect the coupons on the $15,000 of bonds. In the spring of 1894 the Tennessee Coal and Iron bonds were replaced with bonds of an equal amount of Western Union collateral trust, and the Richmond and Danville bonds were replaced by an equal amount of Metropolitan Elevated. With Miss Flint's knowledge they were all registered in the name of Miss Ruthrauff. The whole object and purpose of these gifts was to protect and benefit Miss Ruthrauff and make her more certain to receive the $25,000 in case of Miss Flint's death before the death of Miss Ruthrauff. The opinion of Mr. Justice CHASE then reads: "The statements made by Miss Ruthrauff on receiving these gifts were voluntary statements, and the gift was in no way dependent upon such statements. According to Miss Flint's testimony the gifts were made to depend upon her, Miss Flint, dying before Miss Ruthrauff. They were 'provisional.' The writing of December 22, 1890, . is absolute on its face, but it was only intended for protection to Miss Ruthrauff in case of Miss Flint's death before Miss

Ruthrauff's death.   In case Miss Flint died before Miss Ruthrauff, she undoubtedly intended the gift to be without condition, and that the paper, absolute on its face, should be used as evidence of her intention without qualification.   Miss Ruthrauff says the bonds were all given to her at one time and in her room and not at the Lincoln Safe Deposit Vaults. Miss Flint may be mistaken with respect to this.   Miss Ruthrauff's testimony shows that she accepted the gift with the understanding or qualification that Miss Flint should have the income, except as to the extent of her allowance.   All the occurrences prior to 1896, as well as the letters of Miss Ruthrauff to Miss Flint, indicate a continued recognition of the right of Miss Flint to assert some authority over the disposition of the bonds.   I am satisfied from the whole testimony that Miss Flint intended to make and did make to Miss Ruthrauff a valid gift of the bonds, subject to the income on the $15,000 being retained by her during her life and subject to the gift being entirely defeated in case of Miss Ruthrauff's death occurring before her death, and that a trust was created to carry out such intention."   The justice thereupon appointed a trustee to hold the bonds and pay the income on $10,000 of the bonds to Miss Ruthrauff during her life and on the other $15,000 of bonds to Miss Flint for life, and in case Miss Ruthrauff died before Miss Flint, the principal was to be paid to Miss Flint, and in case Miss Flint died before Miss Ruthrauff, the principal was to be paid to Miss Ruthrauff.

This court affirmed upon the opinion of Mr. Justice CHASE at Special Term, and the decision of this court was affirmed by the Court of Appeals in 163 New York, 588.   I am unable to see why this authority is not conclusive of both questions which are presented in this case.   In the case cited there was both the reservation of the income as to part of the property and a provision for the return of the entire property in case of the death of the donee before the death of the donor.   In the case at bar the income was reserved upon the entire property, but there is no provision as to the return of the property itself in case of the death of the donee before the death of the donor, except in respect of the stock transferred.   It has been suggested that in that case there was held to be a trust, but there was no trust there attempted to be created, except such a trust as was

created by the nature of the gift with the reservations, and so, in the case at bar, this defendant was the trustee of this property for the purpose of delivering the income over to his donor during her life, and upon such trust the stock was to be delivered back in case he died before his donor.

The cases are in my judgment precisely parallel and compel a reversal of this decree.

CLARKE, P. J., concurs.

Decree reversed and matter remitted to the Surrogate's Court for further action in accordance with the opinion of this court.