William Black v. Commissioner.
Black v. Commissioner
Docket No. 2474-63.
United States Tax Court
T.C. Memo 1965-257; 1965 Tax Ct. Memo LEXIS 73; 24 T.C.M. (CCH) 1394; T.C.M. (RIA) 65257; September 27, 1965
Harry Geist, 341 Madison Ave., New York, N. Y., for the petitioner. Stephen M. Miller, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined the following deficiencies in petitioner's gift taxes: Year
Deficiency
1952
$ 268.13
1954
371.25
1958
28,701.66
1959
125,832.57
1960
28,658.83
Respondent also determined additions to tax under section 3612(d)(1) of the 1939 Code in the amounts of $67.03 for 1952 and $92.81 for 1954. Most of the issues have been settled, and the only question remaining to be decided is whether petitioner made a gift to his wife of $1,000,000 in tax exempt bonds in 1959. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner *75 filed his gift tax return for the year 1959 with the district director of internal revenue, New York, New York. Petitioner married Lillian Mandl (hereinafter referred to as Lillian) in 1930. At that time, petitioner was known as William Schwarz. Petitioner obtained a Nevada divorce from Lillian in 1951. Petitioner and Jean Martin (hereinafter referred to as Jean) were married on September 6, 1951. Their only child, Melinda Jean, was born in 1955. Jean was an actress and singer; she has worked on television and in the movies, and has made recordings. She did some radio and television advertising for Chock Full O'Nuts Corporation at a time when petitioner was president, chairman of the board of directors, and majority stockholder of that corporation. On January 15, 1953, petitioner converted a personal checking account at the First National City Bank of New York, Times Square branch, into a joint account with Jean. All deposits made to this account were made by petitioner solely with his own funds. The balance in this account during the years 1958-1960 usually was substantial, often exceeding $100,000 and sometimes $1,000,000. Jean wrote checks on this account for whatever she *76 needed. From January 1, 1958, to May 1, 1960, Jean drew checks totaling almost $400,000. Petitioner periodically received monthly statements and cancelled checks from the bank with respect to the account. There was some question concerning the validity of petitioner's divorce from Lillian. Early in 1959, Jean expressed concern that, if petitioner died, Lillian might intervene in the estate proceedings, causing delay in the settlement of the estate and perhaps even upsetting the provisions made for Jean and the child. Petitioner wanted to make sure that, if he died, Jean would have enough money to live on during any delay in settling his estate. Petitioner and Jean agreed that $300,000 would be sufficient to tide her over in case of his death. Petitioner had recently sold the major part of his business and was buying tax exempt bonds with some of the proceeds. He determined to use $300,000 of tax exempt bonds to provide for Jean's living expenses in case of his death. Petitioner had considered keeping $300,000 cash around the house, but rejected that course because of the danger of fire or theft. Petitioner apprised Jean of his intention to buy the bonds. He told her that while *77 he was alive the bonds were to be his, and she agreed to return them to petitioner if he asked for them. Petitioner instructed Jean that she was to use the bonds only in case of his death. Jean was to use the income from the bonds for household expenses, clothing, and the like. On March 11, 1959, petitioner purchased through a broker $300,000 face value of New York City Housing Authority 4 percent bonds, paying par value plus $596.65 accrued interest. These bonds were delivered to Jean by the broker on March 18, 1959. Both the bonds and the coupons were in bearer form. Petitioner showed Jean how to clip and cash the coupons. He instructed her to place the bonds in a safe-deposit box to which he would have no access, so that the box would not be sealed at the time of his death and Jean would be able to use the bonds. Petitioner went with Jean to the County Trust Company when she placed the bonds in her safe-deposit box. About 6 or 7 months later, Jean again raised the question of her financial security in case of petitioner's death. She had been told by someone that Lillian might well succeed in upsetting petitioner's will. Furthermore, she thought petitioner might dissipate his *78 estate by gifts to charity. Petitioner's net worth in 1959 was somewhere in the area of $10,000,000. However, in 1959 petitioner agreed to give and on December 24, 1959, did give property worth more than $4,400,000 to Columbia University Medical Center. Jean wanted petitioner to give her more security in case of his death. Jean agreed that an additional $700,000 of bonds would be sufficient. On or about November 2, 1959, petitioner brought home $700,000 face amount of New York City Housing Authority 4 percent tax exempt bonds. Petitioner had purchased these bonds, which were in bearer form, on March 13, 1959, at par plus accrued interest of $5,911.09. Until petitioner brought them home, the bonds had been left with petitioner's broker, who clipped the coupons and deposited the proceeds in petitioner's brokerage account. When petitioner delivered the bonds to Jean he told her that the bonds were to be his while he was alive, that she must return them if he so requested, and that she was to use them only in the event of his death. Jean agreed to these terms. As with the $300,000 of bonds, Jean was to use the income for household and other expenses. Petitioner instructed Jean to put *79 the bonds in her safe-deposit box and again went with her when she did so. Petitioner and Jean had no written agreement delineating their respective rights in the $1,000,000 of bonds in Jean's possession. Thereafter, and prior to May 5, 1960, petitioner and Jean separated. Jean retained William G. Mulligan, a New York attorney, to represent her in negotiating the terms of the separation. At this time, petitioner was represented by Isidore Lapan. After the two attorneys conferred for the first time, Lapan wrote Mulligan the following letter, which was dated May 20, 1960: Upon reporting to Mr. Black after our conference, he was amazed to learn that Jean considers the tax-exempt bonds as her property. These securities were purchased by Mr. Black and delivered to Jean so that the coupons could be used to defray living expenses. Before considering any further discussions I have been instructed to request that these bonds be returned to Mr. Black forthwith. When Jean refused to return the bonds, petitioner instituted suit for their return. Before the smoke had cleared, a total of five actions were pending between the parties. (1) Petitioner brought suit #4610/1960 in the Supreme *80 Court of the State of New York, Westchester County, against Jean and the County Trust Company, alleging wrongful conversion of the bonds and praying for their recovery. (2) Jean brought suit #9634/1960 in the Supreme Court, New York County, against petitioner and Lillian, praying for a declaratory judgment that petitioner's divorce from Lillian be declared valid and that Melinda Jean Black be declared legitimate. In this suit, Lillian counterclaimed for a judgment that she be declared petitioner's lawful wife and that petitioner's marriage to Jean be declared void. (3) The People of New York ex rel. Melinda Jean Black by William Black brought action #689/1961, a habeas corpus proceeding, in the Supreme Court, New York County, against Jean, praying that the court fix petitioner's visitation rights with respect to Melinda Jean. The foregoing three actions were commenced in 1960. In 1961, the final two actions were commenced, to wit: (4) Petitioner brought suit #7673/1961 in the Supreme Court, New York County, against Jean, alleging the wrongful withdrawal in 1958 of $274,192 from the parties' joint checking account at First National City Bank of New York, and praying for recovery of *81 said amount. (5) Jean brought suit #30643/1961 against petitioner in the Supreme Court, New York County, praying for a legal separation from petitioner. There were a great many motions and interim appeals in the five actions. In the suit by petitioner for return of the bonds, the court entered an order enjoining Jean from disposing of the bonds during the pendency of the action, and subsequently ordered that the bonds be deposited with the Sterling National Bank & Trust Company, said bank to hold the bonds as custodian pending the outcome of the suit. Eventually, these orders were sustained by an appellate court. Jean then disclosed that she previously had liquidated $100,000 of the bonds, and thus held only $900,000 of bonds, which she turned over to the court appointed custodian. Jean's suit against petitioner and Lillian for a declaratory judgment of the validity of her marriage came on for trial in June 1962 before Justice Capozzoli of the Supreme Court, New York County. Before proceeding with the trial, the judge summoned the attorneys for the parties to his robing room to discuss the possibility of settling all five actions. Charles Rothenberg, representing petitioner, insisted *82 that petitioner would not accept any settlement which did not provide for the return of the bonds and an acknowledgment that they had always belonged to petitioner. Rothenberg had taken the same position in pre-trial conferences with Jean's attorney. Mulligan, representing Jean, thought a fair settlement, which would adequately provide for the financial security of Jean and Melinda Jean, was preferable to going to trial, Jean had been under psychiatric care. On the day of trial she was extremely nervous, and Mulligan feared she might have difficulty in giving testimony. Finally, with the help of Justice Capozzoli, the parties agreed to terms for settling all five actions. A settlement stipulation was executed by petitioner and Jean on June 11, 1962. It provided that Lillian's counterclaim in the declaratory judgment action could be discontinued without prejudice, and that all litigation then pending between the parties, as described above, would be discontinued with prejudice. Jean expressly acknowledged petitioner's ownership of the remaining $900,000 of bonds, which, with all coupons maturing after July 1, 1962, were to be released to petitioner by the custodian. Petitioner also *83 was given the right to keep $60,000 of tax exempt bonds which Jean had previously purchased with her own savings. It was intended that these $60,000 of bonds would compensate petitioner for the $100,000 of bonds which Jean had liquidated. Other provisions of the settlement stipulation dealt with matters commonly covered in separation agreements. Petitioner agreed to pay alimony of $50,000 per year in equal monthly installments to Jean, so long as she remained unmarried, for at least 11 years from July 1, 1962, and thereafter during petitioner's lifetime. If Jean remarried the alimony was to be reduced to $10,000 annually, payable for the same period of time as if she had remained unmarried. After the later of July 1, 1973, or petitioner's death, Jean was to receive $24,000 per year for life so long as she remained unmarried, but her right to such amount would terminate on her remarriage. In June 1962, petitioner and Jean were 64 and 41 years old, respectively, and the parties have stipulated that they had life expectancies of 13.33 and 34.73 years, according to the United States Life Tables, 1949-1951. Besides agreeing to pay alimony to Jean, petitioner agreed to establish a trust *84 for the benefit of Melinda Jean. From this trust, Jean was to be paid $1,000 per month for the support of Melinda Jean, but without any obligation on Jean's part to account for such amount. Payments from the trust were to cease at the earlier of Jean's marriage or attainment of the age of 21. Jean was given custody of Melinda Jean, and petitioner's visitation rights were fixed. Finally, Jean relinquished her rights in certain real estate, petitioner agreed to pay $57,000 as counsel fees to Jean's attorney, and both parties gave up their rights to inherit from the other or to claim against the other's will. The provisions for alimony support, and counsel fees could not be altered in any subsequent proceeding. On June 21, 1962, petitioner and Jean were divorced. In his gift tax return for 1959, which was received by the district director on April 12, 1960, petitioner made no reference to his delivery of $300,000 and $700,000 of tax exempt bonds to Jean. In his notice of deficiency, respondent determined that petitioner had made unreported gifts to Jean of $300,596.65 and $705,911.09, representing the cost to petitioner of the bonds and accrued interest thereon. Opinion The *85 sole remaining issue is whether petitioner made a gift to Jean of $300,000 and $700,000 of tax exempt bonds when he delivered them to her in 1959. We have found as a fact that petitioner, upon delivering the bonds to Jean, told her they were to be used only in case of his death, they were to be his bonds while he was alive, and they were to be returned to him if he asked for them. For the reasons stated below, this finding compels the conclusion that there was no taxable gift. The pertinent provisions of the 1954 Code and the regulations thereunder are set forth in the footnote. [1] They make it abundantly clear that no tax is imposed unless there is a completed transfer, i.e., unless the alleged donor actually surrenders an interest in the supposed subject of the gift. Whether any such interest passes must, of necessity, be determined by applying state law to the objective facts of the transaction. See Charles E. Bedford, 5 T.C. 726 (1945), acq. 1945, C.B. 2; Carl J. Schmidlapp, 43 B.T.A. 829 (1941); cf. Blair v. Commissioner, 300 U.S. 5 (1937). *86 *87 To effect a transfer by gift under New York law, there must be an absolute intention on the part of the donor to divest himself of his rights in the property, and the evidence must be inconsistent with any other theory. Duboff v. Duboff, 18 Misc. 2d 1050, 186 N.Y.S. 2d 760 (Sup. Ct. 1959); In re Dobish's Will, 98 N.Y.S. 2d 838 (Surr. Ct. 1950); see Brown, Personal Property, Sec. 48, pp. 129-30 (id ed. 1955). Where title is to pass only after the death of the alleged donor, the purported gift is testamentary and void. In re Humphrey's Estate, 191 App. Div. 291, 181 N. Y. Supp. 169 (1920); Tyrrel v. Emigrant Industrial Sav. Bank, 77 App. Div. 131, 79 N. Y. Supp. 49 (1902); Brown, Personal Property, supra, Sec. 49, p. 137. And where the alleged donor reserves a right of revocation, the purported gift fails. In re Flamenbaum's Will, 6 Misc. 2d 122, 159 N.Y.S. 2d 887 (Surr. Ct. 1957); In re Dobish's Will, supra."The alleged donor must not have been an "indian giver'." In re Dobish's Will, supra. *88 In the instant case, as we have found, petitioner expressly reserved to himself the ownership of the bonds during his life and the right to have them returned upon demand. Jean was not to have any right to the bonds until after petitioner's death. Her right to use the income was limited to applying it oi household expenses, clothing, and the like. [2] Although petitioner instructed Jean to put the bonds in a safe-deposit box to which he would have no access, his reason for doing so was to ensure that Jean could obtain the bonds after his death. We are of the opinion that, under the applicable state law, as set forth above, there was no transfer of property to Jean. Since the gift tax is imposed only on completed, effective transfers, section 25.2511-2, Gift Tax Regs., Rev. Rul. 58-395, 1958-2 C.B. 398, it follows that petitioner did not make a taxable gift of the bonds to Jean. See Charles E. Bedford, supra.Moreover, even if title to the bonds had passed to Jean, petitioner's right to the return of the bonds upon demand was a right of revocation. Revocable gifts *89 are not taxable. Commissioner v. Walston, 168 F. 2d 211 (C.A. 4, 1948), affirming 8 T.C. 72 (1947); section 25.2511-2 (c), Gift Tax Regs. Respondent's contention that petitioner's delivery of the bonds to Jean constituted a taxable gift is based on the theory that petitioner thereby parted irrevocably with all dominion and control over the property. Respondent would have us disregard the evidence which tends to establish that petitioner retained ownership of the bonds, as well as an unconditional right to their return upon demand, during his lifetime. This we decline to do. The evidence upon which we relied in making our findings as to what was said and done around the time the bonds were delivered to Jean consisted largely of petitioner's testimony at the trial. We found petitioner a forthright and wholly credible witness; moreover, his testimony was corroborated *90 by other strong evidence. For example, Jean, who was called as a witness by respondent, admitted that she was to use the bonds only if petitioner died, so she would have money to live on "while things were being straightened out." In other respects, Jean's testimony upon which respondent relies, was self-contradictory; she did not seem to have a clear recollection of what transpired when the bonds were delivered. Further corroboration for petitioner's version of the transactions is found in events subsequent to 1959. While we agree with respondent that subsequent events cannot alter what transpired at the time of delivery, they are to a certain extent relevant in determining just what transpired. Petitioner claimed ownership of the bonds at least as early as May 20, 1960, which was less than six weeks after his 1959 gift tax return was filed with the district director. Thus, the claim was almost certainly made before respondent had asserted that a gift tax was due on account of the transaction. Moreover, Jean's acknowledgment in the settlement stipulation that petitioner was the owner of the bonds, her return of the remaining $900,000 of bonds, and her relinquishment of her rights *91 in $60,000 of bonds purchased with her own funds all support petitioner's version of the facts. Jean even stated at trial that she did not return the bonds to petitioner when he first demanded them "because I needed the money to live off of, the income," implying that even then she recognized the validity of petitioner's claim to the bonds. [3] Thus, we cannot accept respondent's contention that Jean agreed to the provisions of the settlement stipulation solely to secure an acceptable compromise of the five actions pending between her and petitioner. *92 William H. Board, 14 T.C. 322 (1950), relied upon by respondent, is clearly distinguishable, since the Court explicitly found that the gift there was not conditional. In addition, the Court expressed doubt as to the effectiveness under state law of the alleged condition, which concerned the tax consequences of the gift. The other cases cited by respondent are inapposite and do not require discussion. Respondent's fear that failure to impose a gift tax in the instant case would permit a taxpayer to evade the estate tax is unjustified. Where, as here, there was ample evidence (in addition to petitioner's interested testimony) to support the conclusion that there was no effective transfer or at most a revocable transfer, there is no danger of tax evasion. See section 2031(a) and 2038(a) of the 1954 Code. We hold respondent's determination, that petitioner made a taxable gift to Jean by delivering the bonds to her in 1959, to be erroneous. Decision will be entered under Rule 50. Footnotes
1. SEC. 2501. IMPOSITION OF TAX. (a) General Rule. - For the calendar year 1955 and each calendar year thereafter a tax, computed as provided in section 2502, is hereby imposed on the transfer of property by gift during such calendar year by any individual, * * * SEC. 2511. TRANSFERS IN GENERAL. (a) Scope. - Subject to the limitations contained in this chapter, the tax imposed by section 2501 shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible; * * * Sec. 25.2511-1 [Gift Tax Regs.] Transfers in general. (g)(1) Donative intent on the part of the transferor is not an essential element in the application of the gift tax to the transfer. The application of the tax is based on the objective facts of the transfer and the circumstances under which it is made, rather than on the subjective motives of the donor. However, there are certain types of transfers to which the tax is not applicable. It is applicable only to a transfer of a beneficial interest in property. * * * Sec. 25.2511-2 [Gift Tax Regs.] Cessation of donor's dominion and control. (a) The gift tax is not imposed upon the receipt of the property by the donee, nor is it necessarily determined by the measure of enrichment resulting to the donee from the transfer, nor is it conditioned upon ability to identify the donee at the time of the transfer. On the contrary, the tax is a primary and personal liability of the donor, is an excise upon his act of making the transfer, is measured by the value of the property passing from the donor, and attaches regardless of the fact that the identity of the donee may not then be known or ascertainable. (b) As to any property, or part thereof or interest therein, of which the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another, the gift is complete. But if upon a transfer of property (whether in trust or otherwise) the donor reserves any power over its disposition, the gift may be wholly incomplete, or may be partially complete and partially incomplete, depending upon all the facts in the particular case. Accordingly, in every case of a transfer of property subject to a reserved power, the terms of the power must be examined and its scope determined. * * * (c) A gift is incomplete in every instance in which a donor reserves the power to revest the beneficial title to the property in himself. * * *↩
2. If $40,000 per year for such items be thought to be excessive, it is pointed out that Jean wrote checks upon the joint checking account totaling almost $90,000, and payable solely to clothing and specialty shops and department stores, in the period January 1, 1958 to May 1, 1960.↩
3. Further examples of Jean's testimony which support petitioner's position are: Q. * * * Weren't you afraid that in the event he died you wouldn't have immediate money to get along on until his will was probated? A. That's right. Q. Isn't that so? A. Yes. Q. And wasn't the only reason that these bonds were given to you was that you should hold - in the event he did die, then you should have the bonds; is that right? A. Well, it was worded a little differently, but basically the same thing. Q. That was the gist of it; is that right? A. Yes. Q. Miss Martin, you never had any fears that as long as Mr. Black was alive you could always come to him for money to support you and Melinda; is that right? A. That's right. Q. As a matter of fact, when this argument between you and him was at its height, you called him for money and he sent you checks, didn't he? A. Yes, he did. Q. And all you were concerned about was what would happen if he died? A. Yes. * * *
Question: Going back to Mr. Geist's line of questions, do you mean to say that he gave you these bonds so that if he should die they would not be a part of his will and a part of his estate? A. Well, to sum it up in my own words, if I may, my understanding was that only if something should happen to him, only while things were being straightened out, I wouldn't have to worry about money, because there were tremendous living expenses and he wanted to be sure that my child and I did not have to borrow money.↩